**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOSEPH A. STALLARD,
13450 Farmcrest Ct., Apt 636
Herndon, VA, 20171
(703) 310-7049

*Plaintiff,*

v.

GOLDMAN SACHS GROUP, INC.
200 West Street
New York, NY 10282

GOLDMAN SACHS & CO. LLC
200 West Street
New York, NY 10282

VOODOO SAS
17 rue Henry Monnier
75009 Paris, France

*Defendants.*

Case: 1:20-cv-02703 JURY DEMAND
Assigned To : Walton, Reggie B.
Assign. Date : 9/18/2020
Description: Pro Se Gen. Civ. (F-DECK)

**COMPLAINT**

**JURY TRIAL DEMANDED**

**COMPLAINT**

1. Plaintiff Joseph A. Stallard brings this action against Goldman Sachs Group, Inc. ("Goldman Group") and Goldman Sachs & Co. LLC ("Goldman Co") (collectively, "Goldman" or "Goldman Sachs") and Voodoo SAS for copyright and trademark infringement of his intellectual property and the related racketeering and antitrust violations.

# TABLE OF CONTENTS


NATURE OF THE ACTION ..... 5
PARTIES ..... 5
JURISDICTION AND VENUE ..... 6
Subject Matter Jurisdiction ..... 6
Personal Jurisdiction ..... 7
Goldman ..... 7
Voodoo ..... 8
Venue ..... 10
FACTUAL ALLEGATIONS ..... 10
Trademark Infringement ..... 10
Copyright Infringement ..... 13
Games made with Unity are easy to copy ..... 13
Some of Voodoo's history of copyright infringement, including Unity games ..... 14
Direct evidence Knock Balls copied Knocky Balls ..... 17
Voodoo's Copyright Infringement ..... 18
Racketeering ..... 18
Criminal Copyright Infringement ..... 18
Trafficking in Goods with a Counterfeit Mark ..... 18
Wire Fraud ..... 19
Bribery in Violation of the Foreign Corrupt Practices Act and Travel Act ..... 24
Bribery of U.S. Public Officials ..... 26
Money Laundering ..... 29
Antitrust ..... 31
The free hyper-casual mobile video games market is a valid antitrust market ..... 31
The market is highly fragmented and difficult to enter. ..... 31
Goldman is a giant in a market of pygmies ..... 33
Goldman helped Voodoo dominate the market. ..... 33
COUNT 1 (Voodoo) Willful Trademark Infringement 15 U.S.C. § 1114(1) ..... 35
COUNT 2 (Voodoo) Willful Violation of 15 U.S.C. § 1125(a) ..... 37
COUNT 3 (Voodoo) Willful Counterfeiting 15 U.S.C. § 1117 ..... 37

COUNT 4 (Goldman Sachs) Contributory Trademark Infringement and Counterfeiting 15 U.S.C. §§ 1114(1), 1117 and 1125(a) ..... 39

COUNT 5 (Goldman Sachs) Vicarious Trademark Infringement and Counterfeiting 15 U.S.C. §§ 1114(1), 1117 and 1125(a) ..... 39

COUNT 6 (Voodoo) Willful Copyright Infringement 17 U.S.C. § 501(a)–(b) ..... 40

Direct Evidence of Copying ..... 40

Indirect Evidence of Copying ..... 41

Copyright Infringement ..... 42

Copyright Infringement was willful ..... 42

COUNT 7 (Goldman Sachs) Contributory Copyright Infringement 17 U.S.C. § 501(a)–(b) ..... 43

COUNT 8 (Goldman Sachs) Vicarious Copyright Infringement 17 U.S.C. § 501(a)–(b) ..... 44

RICO PREDICATE ACTS (Voodoo and Goldman Sachs) ..... 44

Criminal Copyright Infringement 18 U.S.C. § 2319 (17 U.S.C. § 506(a)) ..... 44

Trafficking in Goods with a Counterfeit Mark 18 U.S.C. § 2320(a) ..... 45

Wire Fraud 18 U.S.C. § 1343 ..... 45

Voodoo's Knock Balls fraudulently violated of Google and Apple policies ..... 46

Voodoo posted a fake negative review for Knocky Balls ..... 46

Voodoo fraudulently manipulated installs, reviews, and ratings ..... 46

Voodoo fraudulently had Google remove Knocky Balls from Google Play. ..... 47

Voodoo did not remove ads from their games when users paid. ..... 47

Voodoo fraudulently claimed their games were multiplayer when they were not. ..... 47

Goldman's Wire Fraud ..... 48

Travel Act Bribery Violations 18 U.S.C. § 1952(a) ..... 48

Bribery 18 U.S.C. § 201 ..... 49

Money Laundering 18 U.S.C. § 1956 ..... 50

Goldman laundered money to bribe Malaysian officials ..... 50

Goldman laundered money to fund Voodoo's criminal activities ..... 50

COUNT 9 (Goldman Sachs) Federal Civil RICO 18 U.S.C. § 1962(a) ..... 51

COUNT 10 (Goldman Sachs and Voodoo) Federal Civil RICO 18 U.S.C. § 1962(b) ..... 52

COUNT 11 (Goldman Sachs and Voodoo) Federal Civil RICO 18 U.S.C. § 1962(c) ..... 53

COUNT 12 (Goldman Sachs and Voodoo) Federal Civil RICO 18 U.S.C. § 1962(d) ..... 54

COUNT 13 (Goldman Sachs and Voodoo) Restraint of Trade 15 U.S.C. § 1 ..... 55

COUNT 14 (Goldman Sachs and Voodoo) Acquisition in Restraint of Trade 15 U.S.C. § 18 ..... 57

COUNT 15 (Goldman Sachs and Voodoo) Common Law Trademark Infringement and Unfair Competition ..... 58

COUNT 16 (Voodoo) Fraud ..... 59

- Fraudulent misrepresentation to Google and Apple ..... 60
- Posting a fake review ..... 60
- Reporting a false violation to Google Play ..... 61

COUNT 17 (Voodoo) Negligent Misrepresentation ..... 61

COUNT 18 (Voodoo) Tortious Interference ..... 63

COUNT 19 (Goldman Sachs and Voodoo) Unjust Enrichment ..... 64

COUNT 20 (Goldman Sachs and Voodoo) Civil Conspiracy ..... 64

PRAYER FOR RELIEF ..... 65

DEMAND FOR JURY TRIAL ..... 66

## NATURE OF THE ACTION

2. Voodoo distributed a video game infringing the copyrights of Plaintiff Stallard's Knocky Balls video game, and they called it Knock Balls. The name of the game is so similar that Stallard frequently typed the name of the wrong game throughout the complaint. Then Voodoo gave Stallard's game a fake negative review, and then Voodoo reported Stallard's game to Google Play. Google removed Stallard's game from Google Play and put Stallard's developer account in jeopardy.

3. Voodoo has a long history of infringing copyrights and trademarks with their games and ads for their games. They also have a history of various frauds like what they did to Stallard.

4. Goldman Sachs funded Voodoo with at least $200 million, so Voodoo did these activities on a grand scale. The scale was even bigger because Goldman laundered the funds for Voodoo through the Cayman Islands using a $7 billion vehicle called West Street Capital Partners VII. Goldman's racketeering activity funded Voodoo's racketeering activity. The influx of funds from Goldman caused Voodoo to dominate the mobile video game market in a way that violates the antitrust laws.

## PARTIES

5. Plaintiff **Joseph A. Stallard** is an individual and citizen of Virginia, residing at 13450 Farmcrest Ct. Apt 636, Herndon, Virginia 20171, and doing business as **Osgoode Media,** as an individual. Osgoode Media is the registered fictious name for Joseph A. Stallard.

6. Defendant **Goldman Sachs Group, Inc.** is a Delaware Corporation with its principal place of business at 200 West Street, New York, NY 10282.

7. Defendant **Goldman Sachs & Co. LLC** is a New York limited liability company with its principal place of business at 200 West Street, New York, NY 10282.

8. Defendant **Voodoo SAS** is a French simplified joint-stock company (Société par actions simplifiée - SAS) with its principal place of business at 17 rue Henry Monnier, 75009 Paris, France.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

9. This is an action for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*; trademark infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.*; restraint of trade under the Sherman Antitrust Act, 15 U.S.C. §§ 1-7 and Clayton Antitrust Act, 15 U.S.C. §§ 12-27; and racketeering under the Racketeer Influenced and Corrupt Organizations Act ("RICO Act"), 18 U.S.C. § 1961-1968. This Court has original jurisdiction over those claims, under 28 U.S.C. § 1331.

10. This Court also has subject matter jurisdiction under 15 U.S.C. § 4 (jurisdiction over Sherman Act claims), 15 U.S.C. § 1121 (jurisdiction over Lanham Act claims), 28 U.S.C. § 1337 (jurisdiction over antitrust claims), 28 U.S.C. § 1338(a)(jurisdiction over copyright and trademark claims), and 18 U.S.C. § 1964 (jurisdiction over RICO claims). This Court also has jurisdiction over the unfair competition claims under 28 U.S.C. §1338(b).

11. This Court has supplemental jurisdiction over the other claims under 28 U.S.C. § 1367(a) because these claims are so related to the federal claims that they form a part of the same case or controversy and derive from a common nucleus of operative facts.

## Personal Jurisdiction

12. Stallard filed a Waiver of Service of Summons to serve process upon the defendants, which is the same as if he served process on them personally. Fed. R. Civ. P. 4(d)(4). For the sake of brevity, this will be referred to simply as "service" or "service of process", but technically these terms refer to the filing of a Waiver of the Service of Summons.

**Goldman**

13. Stallard served process on GSC and GSG through their common agent registered in the District of Columbia. Thus, Goldman was found in DC, so this Court has personal jurisdiction over the antitrust claims through the nationwide service of process provisions. 15 U.S.C. § 22; Fed. R. Civ. P. 4(k)(1)(C). Goldman is both found and has an agent in DC, so this court has personal jurisdiction over the RICO claims through the nationwide service of process provisions. 18 U.S.C. § 1965(a); Fed. R. Civ. P. 4(k)(1)(C).

14. The service of process on Goldman's registered agent also gives the court personal jurisdiction over Goldman. D.C. Code § 13-334(a); Fed. R. Civ. P. 4(k)(1)(A).

15. Goldman has a consistent pattern of regular business activity in DC. Goldman has a gorgeous penthouse office suite in the "beyond trophy-class building" at 101 Constitution Avenue NW in DC. It is called "the most prestigious commercial address in Washington." It overlooks the US Capitol building. Goldman employs roughly 50 people there, and they have done regular business there since at least 2008.

16. This Court has personal jurisdiction over the RICO and antitrust claims based on nationwide service of process, and this Court has pendent personal jurisdiction over Goldman for the other claims. They arise out of a common nucleus of operative facts with the RICO and antitrust claims, and they are the same claims, but under different statutory and common law

liability. For example, the criminal copyright infringement under the RICO Act claims is the same as the copyright infringement under the Copyright Act. It would be in the interest of judicial economy and fairness to the litigants for the court that tries the RICO claims to try all the claims.

**Voodoo**

17. Under Fed. R. Civ. P. 4(k)(2), this Court has personal jurisdiction over Voodoo because the claims arise under federal law (as described above); Voodoo is not subject to jurisdiction in any state's courts of general jurisdiction; and Stallard served process on the authorized representative (attorney) of Voodoo, while Voodoo was present in the United States before a United States court (and Voodoo had expressly submitted to the jurisdiction of United States courts). This service of process is consistent with due process and the United States Constitution.

18. The United States has jurisdiction over Voodoo because Stallard served process, in the United States, on an attorney representative for Voodoo while she appeared for Voodoo as the plaintiff in a federal civil action against another video game developer (SayGames LLC from Belarus), for copyright infringement. This action is still in progress after being filed on August 4, 2020 in the United States Court of Appeals for the Ninth Circuit. *Voodoo SAS v. SayGames, LLC*, No. 0:20-cv-16486. The action is an appeal from an action in the United States District Court for the Northern District of California, which was dismissed on July 7, 2020, for lack of personal jurisdiction. *Voodoo SAS v. SayGames LLC*, No. 5:19-cv-07480-BLF. The specific agent of Voodoo is Jaime A. Santos, an attorney who is lead counsel for Voodoo's appeal. Her primary office is in DC, and Stallard served process on her at her office in DC. The allegation is not that Voodoo established contacts with the United States and purposely availed themselves of the privileges of US law by filing a lawsuit here. (Although they did). The allegation is that, as a

company, Voodoo is present in the United States while they appear in United States courts as plaintiffs in their civil action. Their presence in the U.S. is in the form of attorneys who represent Voodoo in that lawsuit. As the plaintiff in this action, Voodoo knowingly and expressly consented to the jurisdiction of the United States court and authorized these attorneys to represent them in the United State courts. Stallard served process on Voodoo's lead attorney, not just in the United States, but in DC. Thus, process was served on Voodoo while their company was present in the United States before a US Court of Appeals in that civil action. This service of process establishes personal jurisdiction over Voodoo. Fed. R. Civ. P. 4(k)(2). This service satisfies due process.

19. Also, under Fed. R. Civ. P. 4(k)(2), this Court has personal jurisdiction over Voodoo because the claims arise under federal law (as described above); Voodoo is not subject to the jurisdiction of any state court; Voodoo knew of Stallard's trademark registration with the United States Patent and Trademark Office ("USPTO") and his game's copyright protection in the United States, and continued to willfully infringe anyway by continuing to distribute their game to the United States through United States companies (Google and Apple). Both Google Play and the App Store have country-specific targeting, so Voodoo chose to distribute their infringing game to the United States.

20. Jaime A. Santos is lead counsel for Voodoo's appeal before the United States Court of Appeals for the Ninth Circuit. She was served at her office in DC, so this Court has personal jurisdiction over the antitrust claims through the worldwide service of process provisions. 15 U.S.C. § 22. Voodoo is both found and has an agent (Santos) in DC, so this Court has personal jurisdiction over the RICO claims through the nationwide service of process provisions. 18 U.S.C. § 1965(a). The ends of justice also require that this Court has personal jurisdiction over RICO

claims under 18 U.S.C. § 1965(b) based on this Court's personal jurisdiction over the initial defendant, Goldman, under 18 U.S.C. § 1965(a), or vice versa.

21. This Court has personal jurisdiction over Voodoo for the RICO and antitrust claims through nationwide and worldwide service of process, and this Court has pendent personal jurisdiction over the other claims. They arise out of a common nucleus of operative facts with the RICO and antitrust claims, and they are the same claims, but under different statutory and common law liability. It would be in the interest of judicial economy and fairness to the litigants for the court that tries the RICO claims to try all the claims.

### Venue

22. The Court's personal jurisdiction over Goldman means they are "found" in this district, and thus venue is proper for the antitrust claims under 15 U.S.C. § 22; the RICO claims under 18 U.S.C. § 1965(a); the copyright claims under 28 U.S.C. § 1400(a); and the trademark and other claims under 28 U.S.C. § 1391(b), in view of 28 U.S.C. § 1391(c)(2).

23. Goldman transacts business in this district, so venue is proper for antitrust claims under 15 U.S.C. § 22; and RICO claims under 18 U.S.C. § 1965(a).

24. Voodoo is an alien corporation. Alien corporations may be sued in any judicial district, and they are disregarded in the determination of venue for the other defendants. 28 U.S.C. § 1391(c)(3).

## FACTUAL ALLEGATIONS

### Trademark Infringement

25. On November 5, 2019, Plaintiff Stallard obtained a trademark registration (US Registration No. 5,900,923) with the USPTO for the mark, Knocky Balls, for use on video games.

26. The first use of the Knocky Balls mark in commerce was when the Knocky Balls video game was published by Osgoode Media on the Tizen Store on December 9, 2016, where it remains to this day.

27. The Knocky Balls mark was first used in United States commerce when Knocky Balls was published by Stallard on the Microsoft Store on December 28, 2016, where it remains to this day. Knocky Balls was published by Stallard to Google Play on or before March 27, 2018. Knocky Balls was published on the Amazon Appstore on May 5, 2018; and Game Jolt and itch.io on June 23, 2018, where they remain to this day.

28. On August 10, 2018, Voodoo published a video game to the App Store (iOS) called Knock Balls, and on September 19, 2018, they published Knock Balls on Google Play. The logo for Knock Balls was remarkably similar to Knocky Balls with a ball hitting blocks with a splat icon.

29. On December 12, 2018, Voodoo used a sock puppet account called "Mildred Mullings" to give Knocky Balls a 2 out of 5 rating to damage its position in the Google Play store visibility algorithm (This was its only rating) and scare away potential customers. Her review said, "Game is silly know challenge." Her profile photo was a woman behind the corner of a store. Her name tag is not fully legible, but it does not appear to say Mildred.

30. On December 26, 2018, Stallard applied for trademark registration with the USPTO for Knocky Balls for use on video games, listing himself as the owner of the mark.

31. On June 24, 2019, Stallard filed with the USPTO an application for International Registration with the World Intellectual Property Organization (WIPO) under the Madrid Protocol, with France as the designated country.

32. On July 11, 2019, the USPTO certified the International Application for the Knocky Balls mark, and they forwarded the application to the International Bureau ("IB") of the WIPO.

33. Shortly after the application was approved for publication and forwarded to the IB, Voodoo reported Knocky Balls to Google Play for violation of the impersonation policy. On July 13, 2019, Knocky Balls was removed from Google Play.

34. Google Play's impersonation policy is "We don't allow apps that use another app or entity's brand, title, logo, or name in a manner that may result in misleading users. Don't try to imply an endorsement or relationship with another entity where none exists."

35. On July 31, 2019, the USPTO issued the notice of publication for the Knocky Balls mark. Also, on July 31, 2019, after Knocky Balls was removed from Google Play, Voodoo, using a company called We Buy Apps (calling themselves the "webuyapps_team" using the website https://webuyapps.top/), made an offer to buy Knocky Balls, and cited the Google Play link that had been removed for over 2 weeks. The webuyapps.top website is no longer in use.

36. On August 29, 2019, the International Bureau of the WIPO registered the Knocky Balls mark (Registration No. 1,484,378), and on January 16, 2020, the Institut national de la propriété industrielle (INPI) in France issued a statement of grant of protection for the Knocky Balls mark in accordance with Rule 18ter(1) of the Hague Agreement.

37. On November 5, 2019, the Knocky Balls mark was registered on the Principal Register at the USPTO (Registration No. 5,900,923). Upon registration, Stallard placed the ® symbol next to his uses of the Knocky Balls mark.

38. Voodoo's ads, for their games, infringed on, at least, the following trademarks registered with the United States Patent and Trademark Office (USPTO): Aniosgel (Registration No. 2,924,386), Disneyland (Registration No. 4,866,683), and Cleveland Cavaliers (Registration

No. 3,028,591); and the unregistered trademarks of Lebron James and a deceased YouTuber named Etika. (The ad was "If you beat this level, Etika will come back to life.")

## Copyright Infringement

**Games made with Unity are easy to copy.**

39. C# is a computer programming language. Compilers compile C# code into apps (like Windows EXE files) or code libraries (like Windows DLL files).

40. Tools package these files into a single file, like an Android Package (APK) file or a Tizen Package (TPK) file. Tizen is a mobile operating system (like Android or iOS) for Samsung phones.

41. C# has a feature called "reflection." Reflection refers to looking at a reflection in a mirror. The C# code can see itself. Someone can get the original C# code from a compiled file using reflection.

42. Unity is a popular video game engine. A game engine is the software that game developers use to create video games. Unity can create games for multiple platforms, including iOS, Android, Windows and Tizen. Unity prides itself on being easy to use, even for people without programming skills, so Unity is especially popular among indie developers.

43. Unity uses the C# programming language, so the someone can get the original Unity C# code using reflection. Software can unpack an Android APK or Tizen TPK. Windows installers already unpack the files into a folder. A developer can easily get the original source code and all the other files from a Unity game built for Android, Tizen or Windows.

**Some of Voodoo's history of copyright infringement, including Unity games**

44. Voodoo's game, Hole.io, copied Donut Country, developed by indie developer Ben Esposito for iOS, PC, PlayStation 4, Nintendo Switch and Xbox One. Esposito. Esposito made Donut Country with Unity.

45. Voodoo's game, The Fish Master!, copied Ridiculous Fishing developed by indie developer Vlambeer for iOS and Android.

46. Voodoo's game, "The Cube - What's Inside ?", copied "Curiosity – What's Inside the Cube?" developed by indie developer 22Cans for iOS and Android. 22Cans made "Curiosity – What's Inside the Cube?" with Unity.

47. Voodoo's game, Infinite Golf, copied Desert Golfing developed by indie developer Captain Games for Android, iOS, and Windows.

48. Voodoo's game, Twisty Road!, copied Impossible Road and Super Impossible Road developed by indie developer Kevin Ng for iOS and Android. Kevin Ng created Super Impossible Road with Unity.

49. Voodoo's game, Dune!, copied Tiny Wings developed by indie developer Andreas Illiger for iOS. In 2015, a developer posted the source code for a Tiny Wings clone on GitHub. Dune was published by Voodoo in 2018.

50. Voodoo's game, Paper.io, copied Slither.io developed by indie developer Steve Howse for Android, iOS, and Windows.

51. Voodoo's game, Chilly Snow, copied "Powder - Alpine Simulator" developed by indie developer Dave Chenell for iOS. Dave Chenell created Powder with Unity.

52. Voodoo's game, Flappy Dunk!, copied Flappy Bird by indie developer dotGears (Don Nguyen).

53. Voodoo's game, Sloper, copied Sky Ball developed by Ketchapp.

54. Voodoo's game, Good Slice, copied Fruit Ninja developed by Halfbrick Studios.

55. Voodoo's game, Army Clash, copied Clash of Clans and Clash Royale developed by Supercell.

56. Voodoo's game, Cube Surfer, copied Subway Surfer by Sybo Games. Subway Surfer was made with Unity.

57. Voodoo's ads for Army Clash used copyright infringing video of Clash Royale by Supercell (US Copyright Registration No. PA 1-981-478). Clash Royale is a competitor's video game.

58. Voodoo's ads used copyright infringing images of Walt Disney Pictures new castle artwork by Disney (US Copyright Registration No. VAu 698-293) with the caption "If you dodge 50 bombs, you can go to Disneyland." Voodoo's games do not award Disneyland trips to players.

59. Voodoo's ads used copyright infringing images of András "Hide the Pain Harold" Arató owned by DreamsTime, and they showed the caption "I can't catch a shark :(" or "I can't catch a kraken :(".

60. Voodoo's ads used copyright infringing images of Mickey Mouse by Disney (multiple U.S. copyright registrations), and they showed the caption "If you survive 60 sec you can go to Disneyland." Again, Voodoo's games do not award Disneyland trips to players. Disney did not make these images. One of the images showed Mickey Mouse with his anatomy showing. The other image was a drawing of Mickey Mouse, not by Disney. Another image showed Mickey with balding hair and holding a Mickey Mouse hat with ears, like found at Disneyland.

61. Voodoo's ads used copyright infringing images of Donald Duck by Disney (multiple U.S. copyright registrations), and they showed the captions "If you swallow Big Ben,

you can go to Disneyland" or "If you survive 60 sec you can go to Disneyland." The image of Donald Duck showed Donald with his anatomy showing. Disney did not make the image.

62. Voodoo's ads used copyright infringing images of SpongeBob SquarePants by Nickelodeon/Viacom (multiple U.S. copyright registrations). Some of these images were not original SpongeBob images. One ad showed a picture of an anime version of SpongeBob with the caption "I dare you to score 5 goals!" One ad showed SpongeBob with crying meme face drawn on him and the caption "I can't swallow Big Ben." One ad showed an image of sad SpongeBob with the caption "I can't reach pink color." Ads showed an image of SpongeBob out of breath with one of the following captions: "Me after stacking 50 pieces", "Me after I've assembled 3 blocks in a row" or "When you try to find the bottom"

63. Voodoo's ads used copyright infringing images of Squidward Q. Tentacles from the television show SpongeBob SquarePants by Nickelodeon/Viacom (multiple U.S. copyright registrations). These were not authentic images. One ad showed a picture of Squidward with his brain showing and the caption "No one has reached the ocean." Another ad showed a sad Squidward with the caption "I dare you to score 5 goals!"

64. Voodoo's ads used copyright infringing images of Patrick Star from the television show SpongeBob SquarePants by Nickelodeon/Viacom (multiple U.S. copyright registrations) The ad showed Patrick Star with bloodshot eyes and the caption "If you score 50 you're legally allowed to leave."

65. Voodoo's ads used copyright infringing images of Morty from the television show Rick and Morty distributed on Adult Swim by Cartoon Network owned by Warner Bros. (multiple U.S. copyright registrations). The ad showed Morty with a frustrated look and the caption "I can't reach pick color."

66. Voodoo's ads used a copyright infringing video of Guitar Hero by Activision (multiple U.S. copyright registrations) for their game Stack Colors! Guitar Hero is a competitor's video game.

67. Voodoo's ads used copyright infringing images of Google Maps owned by Google with the caption "Real men don't get wet."

68. Voodoo's ads used copyright infringing images of Kim Jong Un (image owned by Reuters) with the caption "Unlock all the weapons by nuking planets."

69. Voodoo's ads used copyright infringing images of an ACS International Singapore classroom (photograph taken by Aditya Rathod) with the caption "If you score 50, you're legally allowed to leave."

70. Voodoo's ads used copyright infringing photos of LeBron James with the caption "I dare you to score 5 goals!"

71. Voodoo's ads used a copyright infringing copy of a TikTok video by an unknown creator.

**Direct evidence Knock Balls copied Knocky Balls**

72. Stallard made Knocky Balls with Unity, and Voodoo made Knock Balls with Unity. Stallard distributed Knock Balls on Windows (Microsoft Store, itch.io and Game Jolt), Android (Google Play, Amazon Appstore) and Tizen (Tizen Store).

73. Voodoo only distributed Knock Balls on iOS (App Store) and Android (Google Play). Voodoo did not distribute their games on Tizen.

74. Stallard unpacked Voodoo's APK for Knock Balls and found a Tizen.dll. The Tizen.dll file is only needed for Tizen development. This file would not be there for Voodoo who

did not distribute on Tizen, but it would be in Stallard's Unity code because he did distribute his game on Tizen.

75. As described above, Unity games are easy to copy. Knock Balls copied Stallard's Knocky Balls game, using the methods described above. The Tizen.dll was a leftover remnant of the copying process.

**Voodoo's Copyright Infringement**

76. The United States Copyright Office registered the Unity version of Knocky Balls (Registration No. PA 2-154-437) with Stallard as the author and claimant. The effective date of registration is December 26, 2018.

77. On August 10, 2018, Voodoo published Knock Balls on the App Store, and on September 19, 2018, they published Knock Balls on Google Play.

78. Voodoo publicly displayed Knock Balls on their website, social media, and ads.

**Racketeering**

**Criminal Copyright Infringement**

79. As described in the Copyright Infringement section of the Factual Allegations, Voodoo's games infringed the copyrights of the other games, and Voodoo's ads infringed copyrighted material.

80. Voodoo makes money from their copyright infringing games through in-game ads and in-game purchases. Voodoo makes money from their ads by encouraging consumers to download their games.

**Trafficking in Goods with a Counterfeit Mark**

81. See the Trademark Infringement section above.

**Wire Fraud**

*Voodoo's Knock Balls fraudulently violated of Google and Apple policies*

82. Google Play's Developer Program Policy forbids trademark infringement and copyright infringement. It states, "When developers copy someone else's work or use it without required permission, it might harm the owner of that work. Don't rely on unfair use of other people's work."

83. The App Store Review Guidelines also forbid trademark infringement and copyright infringement. The App Store's "Intellectual Property" guidelines state, "Don't use protected third-party material such as trademarks, copyrighted works, or patented ideas in your app without permission."

84. The App Store's "Copycats" guidelines state, "Come up with your own ideas. We know you have them, so make yours come to life. Don't simply copy the latest popular app on the App Store or make some minor changes to another app's name or UI and pass it off as your own."

85. Voodoo knew their Knock Balls game infringed on Stallard's Knocky Balls (See Counts 1-3 and 6), and they still distributed Knock Balls on both Google Play and the App Store in knowing violation of their content policies.

86. Voodoo uploaded infringing versions of Knock Balls to the App Store, and the App Store released those versions on the following dates: August 10, 2018; September 6, 2018; September 16, 2018; September 21, 2018; October 3, 2018; October 11, 2018; November 5, 2018; November 16, 2018; November 22, 2018; December 17, 2018; December 26, 2018; January 11, 2019; January 25, 2019; February 21, 2019; April 8, 2019; April 16, 2019; May 20, 2019; July 11, 2019; Jul 30, 2019; September 3, 2019; June 3, 2020; and September 1, 2020.

87. Voodoo uploaded infringing versions of Knock Balls to Google Play, and Google Play released those versions on the following dates: September 19, 2018; October 19, 2018; October 29, 2018; November 16, 2018; November 22, 2018; December 17, 2018; December 26, 2018; January 11, 2019; January 25, 2019; February 25, 2019; April 8, 2019; April 16, 2019; May 20, 2019; July 30, 2019; September 4, 2019; February 4, 2020; April 3, 2020; April 10, 2020; and May 27, 2020.

*Voodoo posted a fake negative review for Knocky Balls.*

88. Then, Voodoo took their scheme a step further. On December 12, 2018, Voodoo used a fake Google account with the name "Mildred Mullings" to give Knocky Balls a 2 out of 5 rating on Google Play. This bad rating damaged the position of Knocky Balls in the Google Play store visibility algorithm. This was the only rating for Knocky Balls. The bad rating scared potential customers from Knocky Balls to Voodoo's Knock Balls.

89. Google Play's review policy forbids posting fake reviews. It says, "Don't post fake or inaccurate reviews"; "Don't post reviews to mislead other users or manipulate the rating."; and "Don't misrepresent your identity or your connection to the content you're reviewing."

90. The fake reviewer pretended to be Mildred Mullings, but Mildred Mullings died in October 2015. The fake reviewer used broken English in the comment, "Game is silly know challenge."

*Voodoo fraudulently manipulated installs, reviews, and ratings*

91. A "click farm" is a place with many cell phones or devices. Click farm workers operate multiple devices. The users of the devices can rate and review apps/games, install apps/games, click ads or anything else the customer needs them to do. Companies operate click

farms in countries where labor and devices are cheap. Customers can purchase ratings, reviews, installs, ad clicks, etc. from click farms.

92. A "bot" is a computer program that can automatically perform an activity, like rating a video game on Google Play. A bot can post fake reviews and ratings for a video game. They can even generate the text of the review. Bots can even download and install games to a hardware Android or iOS device, or even an emulated hardware device in software.

93. Google Play and the App Store use algorithms to determine which games to feature on the front page of their store and at the top of their search results. These algorithms look at installs, reviews, and ratings to determine visibility. Google and Apple especially look for trending games. A game is trending when it has a lot of installs and high ratings in a short period of time.

94. Bots and click farms can boost the visibility of a game through fake ratings, reviews, and installs. They can trick the store into thinking a game is trending. The trending status boosts the visibility of the game in the store. The increased visibility leads to actual installs. The installs lead to more visibility.

95. Voodoo's website used to say, "We are experts at buying cheap installs in big numbers." They removed the text after a reporter quoted it. Voodoo also described the first step in their strategy for success as "buying users as cheaply as possible."

96. Voodoo admitted to buying installs "in big numbers" "as cheaply as possible.", and Voodoo used these installs to trick Google and Apple into thinking their games were trending. These fake installs lead to more visibility in the stores and more actual installs.

97. The fake review Voodoo posted for Stallard's game was not the only fake review Voodoo posted. As an example of their fake reviews, on January 1, 2020, a user posted a 1-star review that said, "I can't stand all the stupid pop-up commercials that won't go away." Then, on

the same day, Voodoo posted a 5-star fake review that said, "Not very many ads." This was the next review. Voodoo's games are bloated with intrusive ads. A real player would never post that review. The timing and the bad English of the review gives it away.

98. Also, Voodoo incentivized users to give their games 5-star reviews in exchange for free in-game items, in violation of Google Play and App Store policies.

99. Google Play's policy is, "Developers must not attempt to manipulate the placement of any apps in Google Play. This includes, but is not limited to, inflating product ratings, reviews, or install counts by illegitimate means, such as fraudulent or incentivized installs, reviews and ratings." Under examples of common violations, Google lists "Asking users to rate your app while offering an incentive" and "Repeatedly submitting ratings to influence the app's placement on Google Play."

100. Apple's App Store policy states, "If you attempt to cheat the system (for example, by trying to trick the review process, steal user data, copy another developer's work, manipulate ratings or App Store discovery) your apps will be removed from the store and you will be expelled from the Developer Program." It also states, "If we find that you have attempted to manipulate reviews, inflate your chart rankings with paid, incentivized, filtered, or fake feedback, or engage with third-party services to do so on your behalf, we will take steps to preserve the integrity of the App Store, which may include expelling you from the Developer Program."

*Voodoo fraudulently had Google remove Knocky Balls from Google Play.*

101. On July 11, 2019, the USPTO certified Stallard's international trademark application for Knocky Balls for filing with the WPO. Almost immediately after, Voodoo falsely reported Knocky Balls to Google Play for impersonation of Knock Balls.

102. On July 13, 2019, Google Play removed Knocky Balls from the store for violation of their impersonation policy. This violation puts Stallard's Google developer account at risk for a permanent ban.

103. On July 31, 2019, the USPTO issued the notice of publication for the Knocky Balls mark. Also, on July 31, 2019, after Knocky Balls was removed from Google Play, Voodoo, using a company called We Buy Apps (calling themselves the "webuyapps_team" using the website https://webuyapps.top/), made an offer to buy Knocky Balls, and cited the Google Play link that had been removed for over 2 weeks. The webuyapps.top website is no longer in use.

*Voodoo did not remove ads from their games when users paid.*

104. Knock Balls and other Voodoo games use a library called "VoodooSauce."

105. The VoodooSauce library has the code for "in app purchases" (purchases made by the players while they are playing the game), and code for deciding whether to display advertisements during the game.

106. In the VoodooSauce library there is an option for players to pay money to remove advertising from the game.

107. However, the only way the code turns off the advertising is when the in-app purchase is made.

108. This only occurs during the current session. Once the player ends the game, the advertising is no longer removed. However, the player is expecting their payment to permanently remove the advertising every time the player plays the game.

109. Thus, many players have been tricked into paying to remove ads, and this is shown by the many reviews of the game where players complain about paying for the "no ads" option and still seeing ads.

110. Many reviews of the game where players complain about paying for the "no ads" option and still seeing ads.

111. This trickery is present in all of Voodoo's games that use the VoodooSauce library. Voodoo bombarded their games with excessive ads to the point of almost being unplayable, and then tried to get players to pay money to have the ads removed, but they ads were not removed.

*Voodoo fraudulently claims their games are multiplayer when they are not.*

112. An "io" game is an online multiplayer video game. "io" refers to I/O. I/O means input/output. This refers to internet communication. Players assume a game with ".io" or "io" in the title is an online multiplayer video game that they can play with their friends or other human players.

113. Voodoo publishes the at least following "io" games: Hole.io; Paper.io; Paper.io 2; Paper.io 3D; Ladder.io; Snaker.io; Bumper.io; Farmers.io; and Snack.io.

114. These games are represented as "io" games, but they are not online multiplayer games. The games are multiplayer, but the players are computer players. Voodoo gets the usernames of the players from a web page that lists "cool" nicknames. https://pairedlife.com/friendship/cool_nicknames.

**Bribery in Violation of the Foreign Corrupt Practices Act and Travel Act**

115. 1Malaysia Development Berhad ("1MDB") is a wealth management company run by the government of Malaysia. After 1MDB's involvement with Goldman Sachs, it is now insolvent.

116. Tim Leissner was employed by Goldman Sachs between April 1998 and March 2016.

117. During that time, Tim Leissner was a national and resident of the United States.

118. On August 28, 2018, in the United States Courthouse in Brooklyn, New York (United States District Court for the Eastern District of New York), Timothy Leissner plead guilty to conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") and conspiracy to commit money laundering. These acts were during his time as an employee of Goldman.

119. These violations took place between January of 2009 and October of 2014.

120. In his confession to the Court, Leissner admitted: "1MDB was a strategic investment and development company wholly owned and controlled by the Government of Malaysia. As I understood, 1MDB was created to pursue investment and development projects for the economic benefit of Malaysia and its people. While acting within the scope of my employment and with the intent to benefit Goldman and myself, as an employee and agent of Goldman Sachs, I entered into a conspiracy with those individuals identified in the Government's information to pay bribes and kickbacks to obtain and then retain business from 1MDB for Goldman Sachs. The goal of paying bribes and kickbacks was to influence the government officials to take official action so that Goldman Sachs would receive business from 1MDB. I took part in the process of paying some of these bribes and kickbacks. I also knew that some of the funds that would be used to pay bribes and kickbacks to government officials would move through the U.S. banking system."

121. Leissner also admitted to the Court, "During the course of the conspiracy, I conspired with other employees and agents of Goldman Sachs very much in line of its culture of Goldman Sachs to conceal facts from certain compliance and legal employees of Goldman Sachs." He also admitted that he "received large year-end bonuses as an employee and agent of Goldman Sachs."

122. Goldman raised $6.5 billion for 1MDB through three bond sales in 2012 and 2013.

**Bribery of U.S. Public Officials**

123. Goldman Sachs has the nickname "Government Sachs" because of their reputation for bribing high level government officials.

124. Goldman hired Henry M. "Hank" Paulson at 1974. He became Chairman and CEO of Goldman in 1999. On May 4, 1999, under Paulson, Goldman went public with their initial public offering ("IPO") of stock.

125. On May 30, 2006, George W. Bush nominated Paulson as U.S. Secretary of the Treasury. Paulson took office on July 10, 2006.

126. In July 2006, Henry Paulson sold 3.23 million shares of Goldman worth $491 million. He did not pay any taxes. This tax break saved him roughly $200 million.

127. Paulson also received an $18.7 million bonus in 2006, despite working roughly half of the year.

128. At the time, Paulson had restricted stock units ("RSUs") representing 494,054 shares of common stock. When Paulson became Treasury Secretary, Goldman prematurely vested 60% of Paulson's 2004 RSUs and 75% of his 2003 RSUs. A total of 328,834 of his 494,054 shares were accelerated. At the listing price of $152.50, that is over $50 million.

129. Insurance is highly leveraged. A $1 million life insurance policy can cost as low as $1 a day because it is not likely to pay out.

130. A credit default swap is a type of insurance. It pays out on a "credit default." Credit default swaps ("CDS") are often bought on large bundles of mortgages called mortgage backed securities ("MBS"). An MBS can be part of a larger collateralized debt obligation ("CDO"). In an MBS, the mortgage payments are used to pay the investors. The investors are grouped into

tranches. The highest tranches, AAA, or super senior, get paid first, and then the less senior AA tranches, etc.

131. A CDS is highly leveraged, sometimes even 1000-1. Even in 2008, in the middle of the housing crisis, less than 2 percent of homeowners defaulted. The senior and super senior tranches were still getting paid. How can someone fix the game to get paid on those 1000-1 odds, when most people are still paying their mortgage?

132. They can create their own CDO -- called a "synthetic" CDO. A synthetic CDO is not tied to actual mortgage payments. It is tied to the performance of an actual CDO or MBS – called a reference security. If the CDO drops in value, then the credit default is triggered, and the CDS pays out. The owner of the synthetic CDO does not need people to default on their mortgage. They only need to devalue the reference security.

133. The banks that offer these synthetic CDOs use "fair value accounting" or "mark to market." In other words, they mark the price or value of a CDO at what they consider the market value of the CDO. Many of these CDOs are new, and they do not have a market history to determine their market value. Insurance companies rely on the honesty of the bank to give a realistic value of the CDO. A bank could drop the market value of a CDO on a whim. That drop in value would trigger a credit default on the synthetic CDO that references that CDO. That default would trigger a pay out on the CDS, or it might trigger a "collateral call." The insurance contract can require the insurance company to post more collateral to cover the possible losses.

134. A CDS is highly leveraged like life insurance. Even the most solid life insurance company could not handle a situation where most of their customers were making claims. If they could, a $1 million life insurance policy would cost $500,000 to $1 million, and nobody would buy it. The insurance company models price the insurance based on the likelihood of a claim,

among other things. Even the most solid insurance companies are not prepared for an unexpected large scale "run" on claims.

135. A bank could artificially mark the prices of a CDO to below market value to get the 1000-1 payout on the CDS. It would only work if they knew the insurance company could handle a run on CDS claims. It would work if they knew the insurance company would get bailed out by the federal government.

136. That is what Goldman did in 2008. They artificially slashed the market values of CDOs. Then they made collateral calls on the credit default swaps issued by American International Group ("AIG"). They encouraged other companies to do the same. This caused AIG to fail and triggered highly leveraged payouts by AIG to Goldman. Goldman had plenty of their people in the government to guarantee that AIG would get bailed out, and Goldman would get paid 100 cents on the dollar. Hank Paulson ran the show as Treasury Secretary.

137. Joseph St. Denis, an accountant at AIG Financial Products ("AIGFP"), saw it happening, and he tried to intervene. But the head of AIGFP, Joe Cassano "deliberately excluded" St. Denis from doing his job. St. Denis described watching AIG go down, "When I found out about the collateral call, I literally had to sit down. I had to go home for the day." He did not know what Cassano knew. He did not know that Paulson would make sure AIG got a bailout.

138. Goldman also had public officials in high places to guarantee that they would not be punished for what they did. Goldman's Chief Financial Officer ("CFO"), David Viniar barely held back his laughter while he answered questions before the Financial Crisis Inquiry Commission ("FCIC"). Congress appointed the FCIC to investigate the crisis. The FCIC members were baffled at Goldman's explanations about how they priced their CDOs well below market

value and how Goldman were able to get paid 100 cents on the dollar by the government for their for their 1000-1 leveraged credit default swaps.

139. That AIG bailout is one of the public acts by Paulson. To this day, the Shortfall Agreement for AIG bailout is still confidential. There is no reason. All the assets were sold a long time ago, but that agreement has information about Goldman that they do not want the public to see.

140. In 2008, during the crisis, the Federal Reserve allowed Goldman to become a bank holding company, and now they have access to the discount window at the Federal Reserve.

**Money Laundering**

*Goldman laundered money to bribe Malaysian officials in the 1MDB scandal.*

141. On August 28, 2018, in the United States Courthouse in Brooklyn, New York (United States District Court for the Eastern District of New York), Timothy Leissner pleaded guilty to conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") and conspiracy to commit money laundering. These acts were during his time as an employee of Goldman.

142. Leissner admitted that Goldman used the U.S. banking system to send money to bribe Malaysian officials. These violations took place between January of 2009 and October of 2014.

*Goldman laundered money to fund Voodoo's criminal activity.*

143. West Street Capital Partners VII, LP (CIK#: 0001691419) is a Delaware limited partnership with its principal place of business at 200 West Street, New York, NY 10282 (also Goldman's principal place of business). West Street Capital Partners VII, L.P. incorporated in Delaware on October 10, 2016. Their registered agent is Maples Fiduciary Services (Delaware) Inc.

144. On December 21, 2016, Goldman filed a Form D with the Securities and Exchange Commission ("SEC") for the offering of exempt securities for West Street Capital Partners VII, L.P. The securities were pooled investment fund interests. The reported amount sold was $2.5 billion. The total reported amount sold by West Street and its parallel entities was $4.5 billion. Goldman reported the first sale of West Street securities as December 9, 2016. (Goldman's headquarters are on 200 West Street in New York City.)

145. The other entities were West Street Capital Partners VII - Parallel, L.P. (Delaware); and West Street Capital Partners VII Offshore, L.P. (Cayman Islands). West Street Parallel reported $55.65 million sold on their Form D. West Street Offshore did not file a Form D, but they likely sold the remaining $1.94 billion of the $4.5 billion total.

146. West Street Capital Partners VII is directed by Maples Fiduciary Services (Delaware), who also has a Cayman Islands company, Maples Fiduciary Services (Cayman).

147. West Street Capital Partners VII is funded by 867 unknown investors. The accredited investor status of these investors allows West Street Capital Partners VII to avoid reporting to the SEC, despite raising what is believed to be over $7.2 billion over the life of the investment vehicle.

148. Compensation from West Street Capital Partners VII goes to Goldman Co, which is a subsidiary of Goldman Group.

149. A May 28, 2018 press release issued by Goldman and Voodoo stated, "Goldman Sachs – through its West Street Capital Partners VII fund – becomes Voodoo's reference shareholder alongside the Founders who remain majority owners of the company."

150. On November 13, 2019, Voodoo filed a disclosure statement, under Fed. R. Civ. P. 7.1, with the US District Court for the Northern District of California. They provided this certified

statement, "Plaintiff Voodoo SAS ("Voodoo") identifies the following corporation owning 10% or more of Voodoo's stock: Goldman Sachs Group, Inc."

151. Thus, Goldman funded Voodoo through West Street and Maples in the Cayman Islands.

## Antitrust

**The free hyper-casual mobile video games market is a valid antitrust market.**

152. Video games can be divided into 2 categories: casual games and hardcore (or core) games. Casual games are easy to learn and play, and they do not require a large commitment. On the other end of the spectrum, core games have a higher barrier to entry, and they can require a lot of time, attention, and even hardware costs. A hyper-causal game is even further on the spectrum than a casual game. They are designed to be played by anyone on a mobile phone, so the player might not have much time or attention to spend on the game.

153. These types of games are designed for different situations and are not realistically interchangeable. Desktop computer games and console video games cannot be realistically substituted for mobile video games. The devices are different. Paid mobile games cannot be realistically substituted for free mobile games. They are separate categories on the stores, and they are reported separately. Android phones do have the option to load games that are not from Google Play, but there are barriers. Android games from other stores cannot be realistically substituted for games on Google Play.

**The market is highly fragmented and difficult to enter.**

154. The mobile video game market is highly fragmented. There are roughly 350,000 video games on Google Play and 957,000 video games on the App Store.

155. However, any search of Google Play is limited to the top 200 results.

156. The Google search engine is also limited to 200, but few people navigate to page 20 to find out.

157. There are 350,000 video games vying for 200 spots, and like the Google search engine, most people do not see all 200 games. Many indies cannot even find their own game in Google Play on a search of the exact title.

158. Most games are free to play, so consumers do not shop for games. They download what they see on the front page.

159. It is a paradox. A game needs to be a top game to be discovered, but it needs to be discovered to be a top game. Unless the game is featured on the news like Pokémon Go, discovery mainly comes from paid ads, but most developers do not have the money to buy enough ads to get discovered.

160. The actual barriers to publishing a game on Google Play are low. (They are higher for the App Store because it requires a macOS computer, a $100 annual fee, and a more stringent review process.) The barrier to getting people to play (or even view) the game is high.

161. Companies with a lot of money can buy their way to the top with ads. When they get there, it is a self-perpetuating loop. They get more downloads because they are at the top, and then those downloads cause them to stay and the top, which gets them even more downloads.

162. In Q3 of 2019, the top 1 percent of publishers had 9.1 billion downloads out of the total 11.1 billion mobile game downloads in Google Play and the App Store. (82 percent). There were 108,000 publishers. The 445 publishers in the top 1 percent grossing companies generated $15.5 billion of the $16.3 billion revenue from in-app purchases. (95 percent)

**Goldman is a giant in a market of pygmies**

163. The 4 largest public companies in the world by market cap are Apple, Microsoft, Amazon, and Alphabet (Google). Goldman Sachs has more asset dollars ($1.142 trillion) than all of them combined.

164. In December 2019, Goldman Sachs pledged $1.1 trillion to environmental causes by 2030. That commitment would be large by U.S. Congress standards, and the United States is largest economy in the world. Goldman emphasized that it will not pass up any significant amount of revenue because of this commitment. This gives an idea about just how large Goldman is.

165. A world leader commented to them, "If you had a flag, you'd be a country." They have the economy of a large country, but only 38,000 employees.

166. Goldman's enormous size dwarfs any company the video game industry. Activision Blizzard is the largest titan in the industry, but they have less than 2 percent of the total assets of Goldman Sachs ($19.8 billion). Activision Blizzard is not a mobile video game company, like Voodoo. The largest is Zynga. Zynga has 0.2 percent of the total assets of Goldman Sachs ($2 billion).

**Goldman helped Voodoo dominate the market.**

167. On May 28, 2018, Goldman and Voodoo announced Goldman invested roughly $200 million in Voodoo, and Goldman became the reference shareholder. Goldman invested in Voodoo through West Street. They only announced Goldman became the reference shareholder in 2018. They did not announce when Goldman began investing in Voodoo.

168. West Street incorporated in October 2016. Voodoo went from revenues of €1.13 million ($1.3 million) in 2016 to €71 million ($84 million) in 2017 to €325 million ($385 million) in 2018. If Goldman announced their investment in Voodoo in 2016, it would bad. It would look

like Goldman's investment in Voodoo caused Voodoo's revenues to go from $1 million to $84 million in 1 year. Goldman and Voodoo announced their combination in 2018, but the combination began in 2016. Voodoo skyrocketed from $1 million to $84 million because of Goldman's funding. Goldman's funding allowed them to buy large number of ads and clone many games. Otherwise, they would be like other indies – struggling to use their revenues to fund the development and promotion of their next game. Not even the largest game studios (called AAA studios) can fund multiple games from the revenues of a single game, even if the game is a hit.

169. In November 2017, Voodoo and Ketchapp had 48 percent of all arcade game downloads on the App Store. At that point, Voodoo had 11 games that year that were in the top 10 overall on Apple's App Store.

170. By the end of 2018, Voodoo's portfolio of games had reached 1.5 billion downloads with 64 games, 46 of the games were in 2018. In June 2018, among games in the Top 100 US Free Game charts, Voodoo accounted for 24.7 percent of all free game downloads. In that month, Voodoo had 18 games in the top 100.

171. For the year 2018, Voodoo was already number 3 in most mobile app downloads behind Google and Facebook, and number 1 in most mobile game downloads, even topping long-time video game titans like Ubisoft (founded in 1986), Electronic Arts (founded in 1982), and Activision Blizzard (founded in 1979).

172. Voodoo's number of downloads grew over 50 percent in the last 4 months of 2018 (to 1.5 billion total) - shortly after Goldman Sachs became the chief shareholder. As of Q2 of 2019, Voodoo was still number 3 in total app downloads and number 1 in total game downloads, and in April 2019, they had passed 2 billion downloads. In other words, they went from 1 billion to 2 billion in 8 months shortly after Goldman officially acquired them.

173. There were 10 hyper-casual games in the Top Free Charts in Apple's Best of 2019, The Year's Top Games. Voodoo had 5 out of the 10 games.

174. On Sept 17, 2020, Voodoo had 3 of the 5 hyper-casual games in the top 8 free arcade games on Google Play.

175. Voodoo currently has 3.7 billion downloads and 300 million monthly active users. Twitter has 330 monthly active users.

**COUNT 1**

**(Voodoo)**

**Willful Trademark Infringement**

**15 U.S.C. § 1114(1)**

176. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

177. Voodoo has been using the Knock Balls mark on their mobile video game. This infringes on Stallard's Knocky Balls mark, which was used in commerce prior to Voodoo's use of Knock Balls. On November 5, 2019, Stallard registered Knocky Balls with USPTO (US Registration No. 5,900,923), for use on video games, including mobile video games, and, next to the uses of the Knocky Balls mark, Stallard put a symbol with the letter R enclosed within a circle, thus ®. This symbol notified Voodoo of Stallard's registration and satisfied the requirements of 15 U.S.C § 11. The Knocky Balls mark is still in use on video games and mobile games, even for Android devices, despite Voodoo having Knocky Balls removed from Google Play based on its "impersonation" of Voodoo's own infringing Knock Balls mark.

178. 15 U.S.C. § 1114(1) includes 3 types of trademark infringement violations: likely to confuse, likely to cause mistake and likely to deceive. Voodoo used their Knock Balls to deceive

a Google employee who mistakenly removed Stallard's Knocky Balls game for infringing on Voodoo's Knock Balls mark.

179. Both marks were and are used on mobile video games, even in the same store, Google Play, and these games are marketed to the same hyper-casual gaming audience, in particular mobile game players. These hyper-casual mobile video games are free games who make their money on advertisements and in-game purchases. The free nature means that they are impulse downloads by ordinary consumers with little to no scrutiny before downloading the games. Knocky Balls is a fanciful term that does not appear in the dictionary. It was coined for the specific purpose of being used as a trademark for the video game. Knock Balls is almost the same as Knocky Balls.

180. Furthermore, Voodoo's Knock Balls game is bloated with ads that are often unavoidable. They allow users to pay $5 to remove these ads, but the ads still show anyway. Voodoo's use of Knock Balls did not just tarnish the goodwill of Knocky Balls, but Voodoo removed the game entirely from Google Play. Stallard is entitled to Voodoo's profits from Knock Balls. 15 U.S.C. § 1117(a).

181. Voodoo not only knew about the Knocky Balls mark, but they gave it a bad review, had it removed from Google Play, and then tried to buy it.

182. The two marks are almost the same, and Voodoo's game even infringes on Knocky Ball's copyright. The logos for both games show a ball knocking down blocks with a cartoon effect. The similarity of the logos also shows that the trademark infringement of the Knock Balls was willful.

183. Furthermore, both Google Play and the App Store prohibit trademark infringement, and they remove games that violate that policy. Stallard's game was removed based on that policy.

Voodoo would not publish a Knock Balls game to those stores without at least an internet search and a Google Play search for Knock Balls. Both searches would reveal the Knocky Balls game. Stallard obtained a verified Knowledge Panel with Google for Knocky Balls on July 10, 2018. Voodoo first published Knock Balls in August 2018. A Google search for Knock Balls would show the Knocky Balls knowledge panel.

**COUNT 2**

**(Voodoo)**

**Willful Violation of 15 U.S.C. § 1125(a)**

184. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

185. Starting in December 2016, Stallard distributed his Knocky Balls video game worldwide through the Microsoft Store, Tizen Store, Google Play, Amazon Appstore, itch.io and Game Jolt. Then, in August 10, 2018, Voodoo distributed a copyright infringing video game called Knock Balls worldwide through the App Store and later Google Play. (The copyright infringement is discussed in other counts). The marks are almost the same. Count 1 describes how Voodoo's Knock Balls mark did (and is likely to) confuse, cause mistakes, and deceive. Stallard is entitled to Voodoo's profits from Knock Balls. 15 U.S.C. § 1117(a).

**COUNT 3**

**(Voodoo)**

**Willful Counterfeiting**

**15 U.S.C. § 1117**

186. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

187. Stallard registered Knocky Balls on the principal register of the USPTO (US Registration No. 5,900,923) on November 5, 2019 for use on video games, including mobile video games. Voodoo used the Knock Balls mark from August 2018 to the present.

188. Knock Balls is a counterfeit of Knocky Balls. A counterfeit is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark. 15 U.S.C. § 1127. Congress included "substantially indistinguishable" in the statute to prevent counterfeiters from escaping liability by changing the mark in trivial ways. Voodoo changed the Knocky Balls mark to Knock Balls to escape liability. This was a trivial change, so Knock Balls is still a counterfeit of Knocky Balls.

189. Knock Balls is a counterfeit mark of Stallard's registered Knocky Balls mark, even if Voodoo did not know it was registered with the USPTO. 15 U.S.C. § 1116(d)(1)(B). Voodoo did know it was registered. On July 11, 2019, the USPTO certified the International Application for the Knocky Balls mark, and they forwarded the application to the IB of the WIPO. Then Voodoo reported Knocky Balls to Google Play for violation of the impersonation policy. On July 13, 2019, Knocky Balls was removed from Google Play. On July 31, 2019, the USPTO issued the notice of publication for the Knocky Balls mark. Also, on July 31, Voodoo tried to buy Knocky Balls under a false alias and cited the dead link to Knocky Balls on Google Play.

190. Voodoo used the counterfeit Knock Balls mark, so they are liable for $1000 to $200,000 in statutory damages. 15 U.S.C. § 1117(c)(1). Voodoo's use was willful (see Count 1), so they are liable for up to $2 million in statutory damages. 15 U.S.C. § 1117(c)(2). Alternatively, Voodoo is also liable for treble damages for their willful infringement. 15 U.S.C. § 1117(b)(1). The treble damages are based on Voodoo's profits from Knock Balls. 15 U.S.C. § 1117(a).

**COUNT 4**

**(Goldman Sachs)**

**Contributory Trademark Infringement and Counterfeiting**

**15 U.S.C. §§ 1114(1), 1117 and 1125(a)**

191. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

192. Voodoo's Knock Balls mark infringed Stallard's Knocky Balls mark. (See Counts 1-3). Goldman is an experienced investment bank and underwriter. On May 28, 2018, Goldman invested almost $200 million in Voodoo and became a chief shareholder. Goldman backs the Apple Card credit card. The Apple Card has a credit limit as low as $250, but Goldman still denies applicants. Goldman manages almost $2 trillion in assets, yet they will not give some people a $250 credit card. Goldman is careful about their investments and operations. Voodoo is stealing games from indies. Goldman knew Voodoo infringed on intellectual property, and Goldman funded Voodoo's infringement. Goldman willfully funded Voodoo's infringement of Stallard's trademark.

**COUNT 5**

**(Goldman Sachs)**

**Vicarious Trademark Infringement and Counterfeiting**

**15 U.S.C. §§ 1114(1), 1117 and 1125(a)**

193. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

194. Voodoo's Knock Balls mark infringed Stallard's Knocky Balls mark. (See Counts 1-3). Goldman is the chief shareholder in Voodoo. Goldman profited from Voodoo's infringement

of Stallard's trademark. Goldman knew Voodoo infringed on the intellectual property of indies, like Stallard, and Goldman did not try to stop them. In fact, Goldman still funded Voodoo. Plaintiff Stallard incorporates by reference the facts alleged in paragraphs 1-19.

**COUNT 6**

**(Voodoo)**

**Willful Copyright Infringement**

**17 U.S.C. § 501(a)–(b)**

195. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

196. Stallard created the Knocky Balls video game as Crazy Balls. On September 25, 2016, he published Crazy Balls on Google Play. In December 2016, he changed the name to Knocky Balls. On December 26, 2018, Stallard registered Knocky Balls with the United States Copyright Office (Registration No. PA 2-154-437) with himself as the author and claimant.

**Direct Evidence of Copying**

197. As describe above, Knock Balls and Knocky Balls were both made with the cross-platform Unity game engine. Unity games are easy to get the code and game files. Stallard distributed his Knocky Balls game on Tizen, and Voodoo only distributed Knock Balls on the App Store and Google Play. Stallard unpacked Knock Balls and found a "tizen.dll." This shows that Knock Balls used Stallard's Unity code for Knocky Balls.

## Indirect Evidence of Copying

198. Knocky Balls was available worldwide for digital download on major video game marketplaces, including Android (Google Play, Amazon Appstore), Tizen (Tizen Store) and Windows (Microsoft Store, itch.io, Game Jolt).

199. The title of Knock Balls is almost the same as Knocky Balls. Both logos are similar. (a ball hitting 3D blocks with a cartoon splat effect.) They were both distributed in Google Play.

200. Knocky Balls and Knock Balls both similar in at least the following ways. They are mobile video games with a first-person 3D view of stacks of 3D blocks. A 3D sphere (ball) is launched towards the blocks. The ball topples the blocks with realistic physics effects. There are multiple levels starting with Level 1 and progressing in increments of 1 to Level 2, Level 3, etc. The current level is displayed at the top of the screen. The current score is also displayed the top of the screen. Toppling stacks of blocks increases the score. The blocks stack again when they are toppled. The level is complete when the player gains enough points. At the top of the screen, the display shows the progress towards finishing the current level. The more points gained, the closer the player is to finishing the level. At the top of the screen, there is a button to exit the game. The levels display different scenes. One level has a blue-sky background. Another level has a reddish sky background. Another level has dark blue starry sky/space background. The have a block pyramid with 1 block stacked on 2 blocks stacked on 3 blocks. Thus, the gameplay and the overall look, concept and feel of the games are the same.

201. Knock Balls and Knocky Balls were in the same marketplace, had similar logos and almost identical titles. The similar audiovisual material between the games would not be expected to arise independently. The title is arbitrary and fanciful, and would not be expected to

arise independently, especially when attached to such a similar game. It could not be a coincidence. Thus, Knock Balls copied Knocky Balls.

**Copyright Infringement**

202. Stallard has the exclusive right to distribute copies of Knocky Balls, 17 U.S.C. § 106(3), and to display Knocky Balls publicly. 17 U.S.C. § 106(5). Voodoo's distribution and public display of Knock Balls infringes on Stallard's copyrights. 17 U.S.C. § 501(a). Voodoo publicly displayed Knock Balls on their website, social media, and ads. Voodoo distributed Knock Balls on Google Play and the App Store.

203. Actionable copyright infringement is not limited to exact copying. Bootleg copies are not the only form of copyright infringement. The test for actionable copyright infringement is "substantial similarity" between the works. Just like Knock Balls is still a counterfeit of Knocky Balls even with a trivial change to the title (removing the "y"), Knock Balls is Knocky Balls with some trivial changes. Knock Balls and Knocky Balls are still substantially similar enough to rise to the level of actionable copyright infringement. Even if the Court decides they are not similar enough, Knock Balls is still infringing as a derivative work of Knocky Balls. Stallard has the exclusive right to prepare derivative works of Knocky Balls, 17 U.S.C. § 106(2), so Voodoo would still be infringing on Stallard's copyrights, either directly or vicariously and contributory.

204. Starting in August 2018, Voodoo distributed the Knock Balls copy of Stallard's Knocky Balls video game. Voodoo distributed Knock Balls on the App Store, and even on Google Play with Knocky Balls.

**Copyright Infringement was willful**

205. The title of Knocky Balls is the same as Knocky Balls, but without a trivial "y". Even the logo for Knock Balls is like Knocky Balls. Voodoo gave Stallard's Knocky Balls game

a fake bad review, and then reported Knocky Balls to Google Play for a violation of their impersonation policy. After Google Play removed Knocky Balls, Voodoo tried to buy Knocky Balls from Stallard, under a false moniker. They even cited the dead link to Knocky Balls on Google Play. The link had been dead for over 2 weeks.

206. Thus, Voodoo's distribution of Knock Balls is willful copyright infringement. Voodoo is liable to Stallard for the profits of Knock Balls, 17 U.S.C. § 504(b) and the costs of this action. 17 U.S.C. § 505.

**COUNT 7**

**(Goldman Sachs)**

**Contributory Copyright Infringement**

**17 U.S.C. § 501(a)–(b)**

207. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

208. Voodoo's Knock Balls mark infringed Stallard's Knocky Balls game. (See Count 6). Goldman is an experienced investment bank and underwriter. On May 28, 2018, Goldman invested almost $200 million in Voodoo and became a chief shareholder. Goldman backs the Apple Card credit card. The Apple Card has a credit limit as low as $250, but Goldman still denies applicants. Goldman manages almost $2 trillion in assets, yet they will not give some people a $250 credit card. Goldman is careful about their investments and operations. Voodoo is stealing games from indies. Goldman knew Voodoo infringed on intellectual property, and Goldman funded Voodoo's infringement. Goldman willfully funded Voodoo's infringement of Stallard's Knocky Balls game.

**COUNT 8**

**(Goldman Sachs)**

**Vicarious Copyright Infringement**

**17 U.S.C. § 501(a)–(b)**

209. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

210. Voodoo's Knock Balls mark infringed Stallard's Knocky Balls game. (See Count 6). Goldman is the chief shareholder in Voodoo. Goldman profited from Voodoo's infringement of Stallard's Knocky Balls game. Goldman invested almost $200 million. They knew Voodoo infringed on the intellectual property of indies, like Stallard, and Goldman did not try to stop them. In fact, Goldman still funded Voodoo.

**RICO PREDICATE ACTS**

**(Voodoo and Goldman Sachs)**

**Criminal Copyright Infringement**

**18 U.S.C. § 2319 (17 U.S.C. § 506(a))**

211. As described in the Criminal Copyright Infringement section of the Factual Allegations, Voodoo distributed ads with footage of competing video games; distributed ads that infringed on well-known copyrighted material; distributed ads that infringed on other copyrighted material; distributed games that infringed the copyrights of other games; and financially gained from both the ads and the games. These ads with footage of competing games next to their own games could only be willful copyright infringement. The ads infringing on well-known copyrighted material, like Mickey Mouse, could only be willful.

212. As described in Count 6, Voodoo's game, Knock Balls, willfully infringed the copyright of Stallard's Knocky Balls game.

213. Voodoo willfully infringed copyrights for financial gain in violation of 17 U.S.C. § 506(a)(1)(A), so Voodoo is indictable under 18 U.S.C. § 2319. Goldman funded and aided and abetted Voodoo's infringement, so they are punishable as principals. 18 U.S.C. § 2.

**Trafficking in Goods with a Counterfeit Mark**

**18 U.S.C. § 2320(a)**

214. Voodoo intentionally published a video game, Knock Balls, on Google Play and the App Store for financial gain. Knocky Balls is a mark registered in the principal register in the USPTO for use with video games and mobile video games (US Registration No. 5,900,923). Voodoo used the Knock Balls mark in connection with their Knock Balls video game on Google Play and the App Store. Knock Balls is substantially indistinguishable from Knocky Balls. The use of Knock Balls is likely to cause confusion or mistake with Knocky Balls. (See Count 1). Knock Balls also infringed on the copyrights of Knocky Balls. (See Count 6). Voodoo intentionally trafficked the Knock Balls video game. Voodoo knew the USPTO registered the Knocky Balls mark, and Voodoo knew Knock Balls was a counterfeit mark to the Knocky Balls mark. (See Count 1). Goldman funded and aided and abetted Voodoo's trafficking, so they are punishable as principals. 18 U.S.C. § 2.

**Wire Fraud**

**18 U.S.C. § 1343**

**Voodoo's Knock Balls fraudulently violated of Google and Apple policies**

215. Voodoo knew their Knock Balls video game infringed on Stallard's Knocky Balls game. (See Counts 1-3, 6). Voodoo still distributed Knock Balls through legitimate marketplaces - Google Play and the App Store. Voodoo defrauded Google and Apple by misrepresenting that Knock Balls did not violate their content policy against intellectual property infringement and copying other games. (The dates of these misrepresentations are listed in the Factual Allegations section under Wire Fraud.) Voodoo made these misrepresentations through the internet in interstate and foreign commerce.

216. Voodoo made similar misrepresentations to Google and Apple about their games that infringed on other video games. (See Copyright Infringement under Factual Allegations). The dates of these misrepresentations were each date that the video game or an update was uploaded to either Google Play or the App Store. Voodoo made these misrepresentations through the internet in foreign commerce.

**Voodoo posted a fake negative review for Knocky Balls.**

217. On December 12, 2018, Voodoo used a fake Google account with the name "Mildred Mullings" to give Knocky Balls a fake 2 out of 5 rating on Google Play. Voodoo made this misrepresentation through the internet in foreign commerce.

**Voodoo fraudulently manipulated installs, reviews, and ratings**

218. This was not the only fake review by Voodoo. Voodoo posted fake positive reviews for their own games. Voodoo also purchased installs from click farms and/or bots to boost the visibility of their games on the stores. This practice violated the Google Play and App Store policies. Voodoo fraudulently deceived both consumers and Google and Apple through the internet in foreign commerce. A complaint must plead fraud with particularity. Fed. R. Civ. P.

9(b). However, it is not practical to list each fake review of the millions of reviews for Voodoo's games. Stallard included the contents and date of a fake review in the Wire Fraud section in the Factual Allegations. The liability of this form of wire fraud will probably be not be found by examining each individual review. Instead the liability will be determined by grouping the Internet Protocol ("IP") addresses of the ratings, reviews and installs by Google and Apple to detect unusual patterns from possible click farm and/or bot locations.

**Voodoo fraudulently had Google remove Knocky Balls from Google Play.**

219. After July 11, 2019 and before July 13, 2019, Voodoo falsely reported Stallard's Knocky Balls game to Google Play for violation of their impersonation policy. On July 13, 2019, Google removed Knocky Balls from the Google Play. Voodoo made this misrepresentation through the internet in foreign commerce.

**Voodoo did not remove ads from their games when users paid.**

220. Voodoo's games are bloated with ads. Voodoo's games have in-app purchases that allow players to pay to remove the excessive ads. Voodoo misrepresents that the purchase will permanently remove that ads from the game. It only temporarily removes the ads for that session. Voodoo has numerous complaints in their reviews that they do not refund the money. This scheme to defraud players is executed over the internet in foreign and interstate commerce. This fraud happened each time Voodoo uploaded one of their games. Voodoo can get the specific dates from their records.

**Voodoo fraudulently claimed their games were multiplayer when they were not.**

221. Voodoo publishes the at least following "io" games: Hole.io; Paper.io; Paper.io 2; Paper.io 3D; Ladder.io; Snaker.io; Bumper.io; Farmers.io; and Snack.io. Voodoo fraudulently markets these games as online multiplayer video games that players can play with their friends or

other humans. The computer controls the other players, and the players have fake usernames. This scheme to defraud players is executed over the internet in foreign and interstate commerce. This fraud happened each time Voodoo submitted one of the listed games to a store for distribution and each time they advertised that game. Voodoo can get the specific dates from their records.

**Goldman's Wire Fraud**

222. Goldman funded and aided and abetted Voodoo's wire fraud, so they are punishable as principals. 18 U.S.C. § 2. For the sake of brevity, this complaint will not list all the wire fraud violations by Goldman and their employees.

**Travel Act Bribery Violations**

**18 U.S.C. § 1952(a)**

223. The Travel Act prohibits travel with the intent to promote an "unlawful activity", and then promoting (or attempting to promote) that unlawful activity. 18 U.S.C. § 1952(a). In additional to actual travel, the Travel Act prohibits the use of "any facility" in interstate or foreign commerce. "Unlawful activity" includes violating the bribery laws of the United States. 18 U.S.C. § 1952(b). These violations of bribery laws include Foreign Corrupt Practices Act ("FCPA") violations by issuers of securities, 15 U.S.C. § 78dd-1, or domestic concerns. 15 U.S.C. § 78dd-2. Both Tim Leissner and Goldman Sachs are domestic concerns. 15 USC § 78dd-2(h)(1).

224. Tim Leissner pleaded guilty to conspiracy violate the FCPA. Tim Leissner "took part in the process of paying" "bribes and kickbacks to government officials" in Malaysia. He knew "that some of the funds that would be used to pay bribes and kickbacks to government officials would move through the U.S. banking system." Leissner admitted, "The goal of paying bribes and kickbacks was to influence the government officials to take official action so that Goldman Sachs would receive business from 1MDB." The words "bribes" and "kickbacks" are

plural, so there were multiple violations. These violations took place between January of 2009 and October of 2014.

225. Leissner admitted that culture of Goldman Sachs was to conceal their crimes from their compliance and legal employees. He also admitted that he received large year-end bonuses from Goldman Sachs. "During the course of the conspiracy, I conspired with other employees and agents of Goldman Sachs very much in line of its culture of Goldman Sachs to conceal facts from certain compliance and legal employees of Goldman Sachs." He also admitted that he "received large year-end bonuses as an employee and agent of Goldman Sachs." Goldman aided and abetted his FCPA violations and money laundering, so they are punishable as a principal. 18 U.S.C. § 2. Stallard alleges that Goldman did know about this, and they only pretend that they do not know.

226. For the sake of brevity, this complaint will not list all the FCPA violations by Goldman and their employees.

**Bribery**

**18 U.S.C. § 201**

227. After Hank Paulson took office as Secretary of the Treasury on July 10, 2006, Goldman gave him a $18.7 million bonus and accelerated roughly $50 million of his restricted stock units. Goldman bought and continued to buy highly leveraged credit default swaps from AIG to insure their synthetic CDOs. Then Goldman started a run on AIG that would have bankrupted AIG, but Goldman knew that Secretary Paulson would bail out AIG. As Treasury Secretary, Paulson made sure that Goldman was paid 100 cents on the dollar for all their credit default swaps with AIG. Under Paulson, the government did not even ask Goldman to take a "haircut" (less than full value) on their credit default swap contracts. In 2008, Paulson also made sure that Goldman became a bank holding company, so they had access to the Federal Reserve.

228. For the sake of brevity, this complaint will not list the all the other times that Goldman bribed high level U.S. public officials, or all the public acts that Paulson did to benefit Goldman during the 2008 financial crisis.

**Money Laundering**

**18 U.S.C. § 1956**

229. Money laundering is moving money from the United States to (or through) a place outside the United states with the intent to the carrying on of specified unlawful activity. 18 U.S.C. § 1956(a).

**Goldman laundered money to bribe Malaysian officials**

230. Tim Leissner pleaded guilty to conspiracy to commit money laundering. Goldman moved money from the U.S. to Malaysia to bribe officials in the 1MDB scandal. Leissner did not admit to money laundering, but he admitted that Goldman laundered the money through the U.S. banking system to Malaysia to bribe the Malaysian officials. Bribing Malaysian officials is a specified unlawful activity. 18 USC § 1956(c)(7).

**Goldman laundered money to fund Voodoo's criminal activities**

231. Other specified unlawful activities are copyright infringement (18 USC § 2319) and trafficking in goods with a counterfeit mark (18 U.S.C. § 2320). 18 USC § 1956(c)(7)(D). Voodoo infringed copyrights and trafficked in counterfeit goods, as described in the predicate acts above. Goldman moved, at least, almost $200 million from the United States to France to promote those unlawful activities. Goldman used West Street and Maples Fiduciary Services in the Cayman Islands to help facilitate at least some of these transfers.

232. For the sake of brevity, this complaint will not list all the money laundering violations by Goldman and their employees.

**COUNT 9**

**(Goldman Sachs)**

**Federal Civil RICO**

**18 U.S.C. § 1962(a)**

233. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

234. The bribery of Hank Paulson was in 2006. Paulson's official acts were mostly in 2008. The money laundering and bribery of 1MDB was from 2009 to 20014. Goldman made billions from both, and they were the principal in both. In 2016, Goldman created West Street Capital Partners VII using Maples Fiduciary Services in the Cayman Islands. Goldman raised $7 billion in 2017. Goldman laundered this funding through the Cayman Islands and used it to fund Voodoo's unlawful activities. In 2018, Goldman used, at least, roughly $200 million of the proceeds of that income to become the chief shareholder of Voodoo. Voodoo publishes mobile video games in interstate and foreign commerce.

235. The enterprise is an association-in-fact enterprise comprising, at least, Goldman, Voodoo, and the 867 unknown West Street investors. The enterprise is managed, in part, by Maples in the Cayman Islands. The secrecy provided by the Cayman Islands makes it unclear the full extent what the entire enterprise is doing, and who is funding it. At least, the enterprise is involved in interstate and foreign commerce through the distribution of mobile video games and advertisements for mobile video games.

236. Congress specifically designed the RICO Act to prevent money from criminal activities to infiltrate legitimate business, like video game development. Goldman laundered the funds through the Cayman Islands. But for the funding from Goldman, Voodoo would not have

been able to clone Knocky Balls. It would still be the struggling mobile video game company that it was before Goldman began funding it in 2016 to 2017. The massive funding by Goldman gave Voodoo the ad funding to push Knock Balls to the top of the charts on Google Play and the App Store. The huge investment of racketeering proceeds by Goldman greatly increased the damage of Knock Balls to Stallard and his Knocky Balls game. The sheer size and funding of Goldman and West Street (and by extension Voodoo) greatly increased the damages to Stallard.

**COUNT 10**

**(Goldman Sachs and Voodoo)**

**Federal Civil RICO**

**18 U.S.C. § 1962(b)**

237. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

238. Goldman raised $7 billion through West Street using Maples in the Cayman Islands. Goldman laundered at least $200 million of the West Street money through the Cayman Islands to fund and acquire interest Voodoo. Voodoo distributes mobile video games and advertisements in interstate and foreign commerce. Goldman's money laundering was one act in an ongoing pattern of racketeering activity described above. The enterprise is not limited to Voodoo. The enterprise is an association-in-fact enterprise comprising, at least, Goldman, Voodoo, and the 867 unknown West Street investors. At least, it is involved in the same interstate and foreign commerce as Voodoo. The rest of its activities are cloaked in secrecy through the Cayman Islands.

239. Goldman and Voodoo continue to maintain this criminal enterprise through criminal copyright infringement, trafficking in goods with a counterfeit mark, and wire fraud.

Goldman might also have laundered more money through the Cayman Islands or used money laundering to fund secretive activities like buying fake installs, paying fake reviews, etc. Again, the secrecy makes it difficult to know what the enterprise is doing and who is maintaining it. Voodoo's racketeering activities maintains at least part of the enterprise. As part of the enterprise, Voodoo publishes mobile video games in interstate and foreign commerce. Goldman is involved in the financial sector in interstate and foreign commerce.

240. Goldman has been maintaining a broader enterprise through their racketeering activities. This enterprise predates West Street and Voodoo. It involved Wall Street participants, like AIG, during the 2008 crisis, and Malaysian officials in 2009-2014.

241. But for the maintenance of this enterprise, Voodoo would not publish Knock Balls and damage Stallard, and Voodoo would not have the massive amounts of ad money and support for other fraudulent activities to boost the visibility of Knock Balls to increase the damage to Stallard. Voodoo would not have removed Knocky Balls from Google Play, given it a fake bad review, and fraudulently tried to purchase it through a fake company.

**COUNT 11**

**(Goldman Sachs and Voodoo)**

**Federal Civil RICO**

**18 U.S.C. § 1962(c)**

242. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

243. The enterprise is an association-in-fact enterprise comprising, at least, Goldman, Voodoo, Maples, and the 867 unknown West Street investors. At least, it is involved in the same

interstate and foreign commerce as Voodoo and Goldman. Goldman and Voodoo are associated with this enterprise.

244. Goldman participated in the enterprise through bribery and money laundering. Then Goldman laundered some of that money to fund Voodoo. Voodoo participated in the enterprise through a pattern of criminal copyright infringement, counterfeiting and wire fraud. Goldman was also a principal in these activities. They damaged Stallard by infringing his copyrights and trademark. They removed Knocky Balls from Google Play, gave it a fake bad review, and fraudulently tried to purchase it through a fake company.

**COUNT 12**

**(Goldman Sachs and Voodoo)**

**Federal Civil RICO**

**<u>18 U.S.C. § 1962(d)</u>**

245. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

246. As described in Count 9, Goldman, Maples, and the West Street investors conspired to fund Voodoo using the proceeds from racketeering activity, in violation of 18 U.S.C. § 1962(a).

247. As described in Count 10, Goldman, Maples, and the West Street investors conspired to acquire an interest in Voodoo using money laundering, in violation of 18 U.S.C. § 1962(b). Goldman, Voodoo, Maples, and the West Street participants conspired to maintain the enterprise through racketeering activity, in violation of 18 U.S.C. § 1962(b).

248. As described in Count 11, Goldman, Voodoo, Maples, and the West Street participants conspired to conduct the affairs of the enterprise through their racketeering activities, in violation of 18 U.S.C. § 1962(c).

**COUNT 13**

**(Goldman Sachs and Voodoo)**

**Restraint of Trade**

**15 U.S.C. § 1**

249. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

250. The relevant market is the worldwide free hyper-casual mobile video game market. As described in the Antitrust section above, free hyper-casual mobile video games cannot be substituted even for casual mobile video games. The product market is hyper-casual mobile video games, and the geographic market is worldwide on Google Play and the App Store. The market is involved in interstate and foreign commerce.

251. Voodoo distributed mobile games bloated with ads to the point of being almost unplayable. As shown in the Wire Fraud section, when a player gave their game a negative review because of ads, Voodoo would post a fake positive review. If there was a competing game, Voodoo gave that game a fake negative review. They did this to Stallard's Knocky Balls game. Voodoo game players free in-game items in exchange for a 5-star review, in violation of Apple and Google's policies.

252. These are anticompetitive actions, but the antitrust liability comes from the sheer market power of Goldman Sachs. As the Supreme Court put it, Goldman is a "deep pocket parent"

in a market of pygmies. After Goldman contracted, combined, and conspired with Voodoo, Voodoo dominated the market as described in the Antitrust section of the Factual Allegations.

253. Ultimately, under a rule of reason analysis, the antitrust issue here is that Voodoo gained market dominance by the racketeering activities described in the other Counts, and by having a deep pocket parent to fund those activities on a grand scale, and not through superior products, innovation, or business acumen. The large video game companies got their success through decades of making great games. Activision (of Activision Blizzard) made Pitfall! for the Atari 2600 in 1982. Nintendo made card games in 1889 (yes, 1889). Even the large mobile game companies had many years. Zynga made Words with Friends in 2009. King made Candy Crush in 2012. Goldman made their money in finance. Voodoo's dominance in the video game market is from Goldman's dominance in the finance market. Goldman and Voodoo's combination created undue concentration in the market that crowded out other games

254. That might concentration is anticompetitive when it comes from funding and racketeering activities. Consumers benefit when the video game market rewards great games, not deep pockets. Goldman and Voodoo will argue that their funding allowed them to provide many great games to consumers. The reputation of Voodoo in the gaming community disputes that argument. Ignoring the activities in the other Counts, Voodoo is known for spammy ads on social media and games bloated with ads and spammy popups that ask for permission to collect player's data to target the ads. Consumers do not like these things.

255. Stallard was damaged because Goldman funded Voodoo and made them the size that they are. But for Goldman, Voodoo would not have infringed Stallard's game, or at least not to the scale they did.

**COUNT 14**

**(Goldman Sachs and Voodoo)**

**Acquisition in Restraint of Trade**

**15 U.S.C. § 18**

256. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

257. In this case, the product market is the free hyper-casual mobile video game market for the reasons specified in Count 13. The geographic market is the United States. The market involves interstate commerce of video games through Google Play and the App Store.

258. Section 7 of the Clayton Act (15 U.S.C. § 18) is like Section 1 of the Sherman Act (15 U.S.C. § 1), but Congress intended Section 7 to arrest the anticompetitive effects of market power in their incipiency. Congress designed it to stop a harmful acquisition before it restrains trade. It prohibits acquisitions whose effect "*may be* substantially to lessen competition." The prevailing fear was trends toward economic concentration. It applies to conglomerate mergers like the one between Voodoo and Goldman.

259. In 2018, Goldman acquired the stock of Voodoo, and became a reference or chief shareholder. As described previously, Goldman's size dwarfs even the largest video game companies. Goldman especially dwarfs the hyper-casual companies. As described in the Antitrust section above, after Goldman's acquisition of Voodoo stock, Voodoo obtained a roughly 25 percent concentration in a highly fragmented and difficult to enter market, and 50 to 60 percent concentration of the top games in that market. The acquisition of Voodoo stock by Goldman *may* substantially lessen competition in the market in violation of 15 U.S.C. § 18. The acquisition also provided the funding to Voodoo to do the activities listed in this complaint that damaged Stallard

and his game. Goldman will say their stock purchase was purely for investment, but the timing of the investment and the subsequent domination of Voodoo indicates otherwise.

**COUNT 15**

**(Goldman Sachs and Voodoo)**

**Common Law Trademark Infringement and Unfair Competition**

260. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

261. Stallard registered Knocky Balls with USPTO (US Registration No. 5,900,923), for use on video games, including mobile video games. Stallard distributed his Knocky Balls video game on many digital storefronts, including Google Play. After Stallard distributed Knocky Balls, Voodoo distributed a copyright infringing version of Knocky Balls called Knock Balls.

262. Knock Balls is the same as Knocky Balls, except for an insignificant "y." While typing this complaint, Stallard frequently typed Knock Balls instead of Knocky Balls, and vice versa. It is difficult to tell the difference between the marks. Both Google Play and the App Store display the title of the games with the same font and font size, so there is no visible differentiation between the two titles. Even the logo for Knock Balls is like Stallard's logo for Knocky Balls. They both show a ball hitting 3D blocks with a cartoon splat effect.

263. Knocky Balls is not a word in the dictionary. It was chosen specifically to be used a trademark for the game. However, now that Knock Balls exists, a user cannot type Knocky Balls into Google, Google Play, or Bing without getting Knock Balls in the auto complete. Google and Bing are confused. They think Knocky Balls is Knock Balls.

264. Both Knock Balls and Knocky Balls were distributed on Google Play. That was true until Voodoo had Knocky Balls removed by Google for impersonation. (Knocky Balls existed first.) They are both distributed on digital storefronts.

265. The game Knock Balls copied Knocky Balls. Knock Balls is riddled with ads, and it receives many complaints about the ads. So much so that Voodoo allows people to pay to remove the ads. The ads were only temporarily removed. Voodoo in general has a bad reputation among gamers. The bad reputation of Knock Balls ruined the goodwill of the Knocky Balls mark. Do not let the good reviews fool you. Most of the good reviews are fake, and Voodoo forced users to give the game 5 stars to progress in the game.

266. Both Knock Balls and Knocky Balls are free games, so they are impulse downloads.

267. Voodoo has a long history of infringing the intellectual property of indie video game developers. Indies lack the resources to fight back. Voodoo's Knock Balls mark willfully infringed on Stallard's Knocky Balls mark, so Stallard is entitled to Voodoo's profits from Knock Balls. Goldman knowingly funded Voodoo's infringement, and Goldman profited from Voodoo's infringement and continued to fund them anyway. Goldman is liable for vicarious and contributory infringement.

**COUNT 16**

**(Voodoo)**

**Fraud**

268. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

**Fraudulent misrepresentation to Google and Apple**

269. Google Play and the App Store have content policies that forbid copyright and trademark infringement, so they can eliminate any vicarious liability. Google's policy stated, "When developers copy someone else's work or use it without required permission, it might harm the owner of that work. Don't rely on unfair use of other people's work." Apple's guidelines stated, "Come up with your own ideas... Don't simply copy the latest popular app on the App Store or make some minor changes to another app's name or UI and pass it off as your own."

270. Every time Voodoo uploaded Knock Balls or made an update to the store page for Knock Balls, Voodoo falsely represented to Google and Apple that Knock Balls was not violating their content policies. (These dates are listed in the Factual Allegations section under Wire Fraud). Knock Balls would not be allowed in the marketplace if Google or Apple knew Knock Balls violated their content policies. Voodoo knew Knock Balls violated the content policy, so Voodoo intended to deceive Google and Apple into distributing Knock Balls, despite its violation of their content policies. Voodoo damaged Stallard by distributing Knock Balls through Google Play and the App Store, and Knock Balls is a "copycat" of Knocky Balls.

**Posting a fake review**

271. On December 12, 2018, Voodoo posted a fake review of Knocky Balls on Google Play. They posted the fake review through a user with the fake name of "Mildred Mullings." They gave Knocky Balls a rating of 2 out of 5 stars with the comment: "Game is silly know challenge."

272. Voodoo falsely represented that they were an actual user giving an honest review, but they knew they were giving a fake review. Voodoo intended to deceive potential players who would view the Knock Balls store page on Google Play. Voodoo also intended to deceive Google's algorithm that uses the ratings of a video game to determine the visibility of the game on Google

Play. Voodoo's bad review scared away potential players and lowered the visibility of Knocky Balls on Google Play.

**Reporting a false violation to Google Play**

273. On July 11, 2019, the USPTO certified Stallard's international trademark application for Knocky Balls for filing with the WPO with France as the designated country. (Voodoo is based in France.) On July 13, 2019, Google Play removed Knocky Balls from the store for violation of their impersonation policy. On July 31, 2019, the USPTO issued the notice of publication for the Knocky Balls mark. Also, on July 31, 2019, the USPTO issued the notice of publication for the Knocky Balls mark. On that same day, Voodoo offered to buy Knocky Balls from Stallard. Voodoo sent the email to Stallard using a fake company called "We Buy Apps." The email cited a link to Knocky Balls that had been dead for 18 days because Google removed Knocky Balls from Google Play.

274. Shortly after July 11 and before July 13, Voodoo falsely reported Knocky Balls to Google for false violation of their impersonation policy. Voodoo knew that Knocky Balls did not impersonate Knock Balls. Voodoo intended to deceive Google, and Google removed Knocky Balls from the Google Play on July 13. Voodoo tried to take Knocky Balls out of the picture.

**COUNT 17**

**(Voodoo)**

**Negligent Misrepresentation**

275. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

276. Google Play and Apple's App Store distribute millions of apps. To avoid vicarious liability for those apps, Google and Apple have content policies. These policies prohibit both

copyright and trademark infringement. Google Play's Developer Program Policy states, "When developers copy someone else's work or use it without required permission, it might harm the owner of that work. Don't rely on unfair use of other people's work." The App Store Review Guidelines state, "Come up with your own ideas. We know you have them, so make yours come to life. Don't simply copy the latest popular app on the App Store or make some minor changes to another app's name or UI and pass it off as your own." They do not have the resources to fully investigate the intellectual property of each of the millions of apps. They rely on the honesty of the developers and publishers. As a registered developer, Voodoo has a duty to Apple and Google to avoid distributing video games that violate their content policies.

277. Each time Voodoo uploaded or updated Knock Balls or edited the store page of Knock Balls, Voodoo falsely represented to both Google and Apple that Knock Balls did not violate their content policies. The specific dates are listed in the Racketeering section of the Factual Allegations under Wire Fraud. Google and Apple relied on those representations when they distributed the game and made the store page available to users. If Google or Apple knew the representations were false, they would not distribute Knock Balls or display its store page on their platform. Google removed Knocky Balls from Google Play because they thought it violated the impersonation policy.

278. Stallard and his Knocky Balls game were damaged by Voodoo's false representations that allowed Voodoo to distribute their infringing Knock Balls game through legitimate channels.

## COUNT 18

## (Voodoo)

## Tortious Interference

279. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

280. Stallard had a business relationship with Google to distribute Knocky Balls through Google Play. Voodoo knew Knocky Balls was on Google Play. Almost immediately after Stallard's Knocky Balls WIPO international trademark application (designated in France) was certified by the USPTO, Voodoo asked Google to remove Knocky Balls from Google Play for violation of their impersonation policy. Even though, it was Voodoo's Knock Balls game that was violating the impersonation policy. Google Play did remove Knocky Balls. This false violation put Stallard's Google Play developer account in jeopardy of a lifetime ban. He cannot simply restore Knocky Balls, or he risks another strike and a permanent ban.

281. Stallard also had a business expectancy with the Google Play users, who might download his game. Voodoo knew Knocky Balls was on Google Play, and the cloned Knocky Balls with a game called Knock Balls. Then they used their Goldman Sachs money to push Knock Balls to the top of the charts, so it looked like Knocky Balls was the imitation of Knock Balls. (Even Google believed it when they removed Knocky Balls from the store). Knock Balls was loaded with ads, and used offensive ads calling people rednecks. This tarnished the goodwill of Stallard's Knocky Balls game with potential customers.

**COUNT 19**

**(Goldman Sachs and Voodoo)**

**Unjust Enrichment**

282. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

283. Voodoo took Stallard's Knocky Balls video game and distributed it as their own Knock Balls video game. They even sold Knock Balls in Google Play, and they had Stallard's Knocky Balls game removed from Google Play. Goldman used their vast wealth to promote Voodoo's Knock Balls game. They even used an ad that said, "Are you redneck enough?" They effectively hijacked Stallard's Knocky Balls game, so he cannot distribute it without people thinking it is Voodoo's Knock Balls game. It is not possible to undo the damage that was done.

284. Voodoo and Goldman unjustly profited and continue to unjustly profit from Knock Balls. The equitable remedy is to disgorge them of their profits and give them to Stallard.

**COUNT 20**

**(Goldman Sachs and Voodoo)**

**Civil Conspiracy**

285. Plaintiff Stallard realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint.

286. Goldman funded Voodoo with almost $200 million, and Goldman became a chief shareholder in Voodoo. Goldman is an experienced underwriter. They would not even give someone a $250 Apple credit card without due diligence. Goldman did their due diligence before entering this agreement. Goldman knew how Voodoo made its money, and they wanted to fund and be a part of Voodoo's scheme.

287. Goldman provided Voodoo with both funding and expertise. Goldman has many subsidiaries and connections in secrecy jurisdictions like the Cayman Islands and Jersey (Channel Islands). Goldman can get secret funding for Voodoo or help Voodoo secretly fund things like click farms.

288. Together Voodoo and Goldman cloned Stallard's Knocky Balls game. They even used a counterfeit title – Knock Balls. They fraudulently distributed their counterfeit game through legitimate storefronts - Google Play and the App Store. Even though, Knock Balls violated the content policies of those stores. They fraudulently gave Knocky Balls a fake bad review on Google Play, so Knocky Balls could not be found by users. Then when they saw the French international trademark certification for Knocky Balls, they had Knocky Balls outright removed from Google Play.

289. This conspiracy means Voodoo and Goldman are jointly liable for all the tort claims in their common scheme, including copyright infringement, trademark infringement, unfair competition, fraud, negligent misrepresentation, tortious interference, and unjust enrichment.

## PRAYER FOR RELIEF

Stallard respectfully requests:

A. entry of judgment in his favor,

B. an accounting and the disgorgement of defendants' profits,

C. pre-judgment interest and post-judgment interest,

D. divestiture, dissolution, reorganization, restrictions on future activities by violators of the RICO Act,

E. an injunction prohibiting Voodoo and Goldman from anti-competitive conduct,

F. a court order declassifying the Shortfall Agreement for the AIG bailout,

G. an injunction preventing retaliation against Plaintiff Stallard by Goldman and Voodoo,

H. an award of actual, compensatory, punitive, statutory, and treble damages,

I. fees and costs,

J. and such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Stallard respectfully requests a trial by jury on all triable issues in accordance with Fed. R. Civ. P. 38.

Dated: September 18, 2019

Respectfully submitted,

Joseph A. Stallard
13450 Farmcrest Ct. Apt 636
Herndon, VA 20171
(703) 310-7049
*Pro se Plaintiff*